In the Matter of the Estate of ELIZABETH M. HAAS, Deceased.

Fourth Department, October 23, 1969.

*Daniel Scanlon* and *Henry H. Willmott* for Ruth K. Child and National Bank of Northern New York.

*Dunk, Conboy, McKay & Bachman* (*Lawrence Conboy* of counsel), in person and for the Watertown Cemetery Association.

*Fuller, Giles, Maloney, Marsh & Goodwin* (*Roy A. Fuller* and *Clarence F. Giles, Jr.*, of counsel), in person and for the Rector, Church Wardens and Vestrymen of " Trinity Church ".

*Louis J. Lefkowitz, Attorney-General* (*Sidney L. Grossman* of counsel), for the New York State Cemetery Board and Division of Cemeteries and charitable beneficiaries.

*Leon Schwerzmann, Jr.*, in person.

*Per Curiam.* This is a proceeding instituted by order requiring the Surrogate of Jefferson County to show cause (1) why he should not be restrained from further acting on the ground of his incapacitation as such judicial officer as to matters now pending in this estate or which may be presented subsequently therein and (2) why an opinion of the Surrogate dated June 26, 1969 should not be expunged. A proper understanding of the issues requires a factual statement.

Elizabeth Haas, the decedent, died in Jefferson County on January 15, 1966 at the age of 88 leaving a will dated January 24, 1955. Her estate at date of death was subsequently appraised for estate tax purposes in excess of $7,700,000. The executors named in the will — an attorney and a Watertown bank — subsequently qualified and have been represented by a firm of attorneys two of whose members are among the petitioners herein. The will made numerous specific bequests to various charities and to friends of testatrix but the major portion of the estate was left to two residuary legatees — Trinity Episcopal Church of Watertown (herein " church ") and Watertown Cemetery Association (herein "cemetery association "). The other two petitioners in this proceeding are members of the law firms which throughout have represented respectively the church and cemetery association.

Testatrix was survived by two nieces as her only next of kin and distributees. These individuals contested probate of the will alleging that the instrument was not properly executed; that testatrix was incompetent to execute the will and that it

was the product of fraud and undue influence. They were represented by a Syracuse firm of attorneys, who have appeared in this proceeding, but are not petitioners. After there had been pretrial examinations of the witnesses to the will and others, including representatives of the church and cemetery association, one of the attorneys for contestants sought out the attorney for the church, and initiated settlement discussions. These discussions continued with the respective attorneys for the cemetery association and executors participating. Tentative agreement was eventually reached by the terms of which the objections to probate of the two nieces would be withdrawn on payment to each of them of $150,000 and each would renounce a specific legacy of $5,000.

At this point the several attorneys — because of special legal provisions affecting cemetery associations and charitable gifts in trust — considered concurrence of the Attorney-General and approval by the Supreme Court as prerequisites to completion of settlement. In passing it should be pointed out that only the Supreme Court had authority to authorize the cemetery association to pay money from its principal fund to contestants (Membership Corporations Law, § 86-a, subd. 2).

In the light of the subsequent innuendos — if not open charges — by the Surrogate in his opinion of 96 single-spaced pages dated June 26, 1969 that this compromise settlement and subsequent approval thereof was the product of " collusion " among the respective attorneys and that the Attorney-General was " complacent and cooperative ", it should be said that the record discloses that the proposed compromise was the subject of conferences in New York City attended by the First Assistant Attorney-General and the Assistant Attorney-General in charge of estates and trusts. It was at the suggestion of the latter two — for legal reasons unnecessary here to state — that the cemetery association agreed to increase its contribution from $150,000 to $175,000 which resulted in decreasing to $125,000 the amount contributed by the church. In addition the attorneys for the proponents consulted four outstanding attorneys in the Fifth Judicial District each of whom expressed an informal opinion that the proposed settlement was advantageous from the standpoint of the two residuary legatees. One of these attorneys was Chancellor of the Diocese of Central New York of the Episcopal Church, who specifically expressed his approval as Chancellor and advisor to the residuary legatee, Trinity Episcopal Church.

Thereafter and in September, 1966 the attorneys for the contestants brought a proceeding in Supreme Court, Onondaga

County, seeking approval of the compromise of the controversy and authorizing the cemetery association to make such settlement. Following a hearing at which all the parties were represented by counsel and the Attorney-General appeared, an order was made on October 10, 1966 approving the proposed settlement and authorizing the cemetery association to pay its agreed share to the contestants.

It is this order that some two years later became the object of the wrath of the Surrogate and was the target for vituperative, intemperate remarks in his opinion, including the charges that the Justice of the Supreme Court who made the order was "inexperienced in the field and unfamiliar with the nature of the problem concerned" and that "contestants' attorneys either were sacrificing their clients' interests to their own" or "the contestants' chief attorney misrepresented the merits of their case to the Supreme Court." This unjudicial language permeates his answer in this proceeding where, among other things, petitioners herein are charged with "continuing to compound the perpetration of a fraud upon their clients and the ultimate beneficiaries of their clients, contrary to law, the Canons of Professional Ethics and public policy."

The attorneys for the executors thereafter moved to have the will admitted to probate. A lengthy hearing was held before the Surrogate on October 25, 1966. Thereat the Surrogate questioned closely all the attorneys who had appeared in the Supreme Court proceeding because, as the Surrogate phrased it, he had reservations "about this whole Supreme Court episode." He was openly critical of the Supreme Court order and expressed his intention to go to the Supreme Court Justice who made the order, "the Attorney General and the Judicial Conference. There has been no legitimate inquiry — no inquiry at all — I don't want the Supreme Court telling me how to run estates."

The proceeding was adjourned for one month and on November 30, 1966 the Surrogate made a decree admitting the will to probate. In a short memorandum the Judge stated that he was so doing "not because (the court) feels the compromise which the parties have entered into has been or can be justified on any of the grounds originally advanced by counsel, but rather because there has recently been uncovered an exceedingly dangerous tax threat to the residuary beneficiaries which at this late date in the proceeding can only be removed by the immediate probate of the will."

There the matter apparently ended and the administration of the estate proceeded in its normal course. So far as the record

discloses for some two years the Surrogate accorded full faith and credit to the October 10, 1966 order of Supreme Court and to his decree of probate of November 30, 1966, which, of course, recognized the validity of the Supreme Court order.

In early 1968 the respective attorneys for the church and cemetery association and a third attorney, who represented a charitable organization which received a specific legacy, commenced a proceeding (SCPA 2110) for allowances to be paid out of the estate as an expense of administration for their services in aid of probate of the will. The applications of counsel for the two residuary legatees were denied with leave to renew upon the ground that their papers were insufficient. The Surrogate by decision dated August 30, 1968 wrote '' that neither (attorney) has the slightest concept of the proof involved in a proceeding of this kind.'' Curiously, however, the third attorney, who had not participated in the Supreme Court proceeding, was made an allowance although his papers were found by the Surrogate to be similarly defective.

This opinion of August, 1968 directed submission of a proposed order. Such was done and the instrument became the subject of a lengthy hearing on September 24, 1968. Thereat the attorneys for the first time disclosed that they proposed to appeal to this court from the denial of their applications for allowances. After considerable discussion the Surrogate directed his attention to the then two-year-old order of Supreme Court. Among other things he said: '' I never to this day have agreed you had a valid judgment (from a named Justice of Supreme Court). I don't think to this day you can support that judgment. There were so many things wrong with it that I don't think you've got a valid determination to-day.'' Later in the hearing he questioned one of counsel as to why he went to the Supreme Court. When counsel replied that none of them should denigrate or question a decision of Supreme Court, the Surrogate replied: '' I will denigrate a court, if it doesn't carry out its function — the Appellate Division or the Supreme Court. I don't look at it as you do (naming the attorney), and I have taken that position constantly. This isn't a brotherhood in which we protect the courts.''

In passing it should be stated that at this hearing the Surrogate for some inexplicable reason, for some 10 pages of the record, made intemperate, contemptuous and insulting remarks about this court and the rescission by it of certain rules adopted by the Surrogate without our prior approval (cf. N. Y. Const., art. VI, §§ 28, 30; Judiciary Law, §§ 214, 216; SCPA 105). We have no statutory authority to discipline a Surrogate but there

is an appropriate forum for such action (N. Y. Const., art. VI, § 22). However, we consider these remarks irrelevant to the issues presented and have not considered them in making our decision.

At a further hearing on October 8, 1968 the Surrogate stated that he intended to write a decision and "it's going to be a rather long one." The motive for this writing was stated to be "whether there was any basis whatsoever" for the making of the Supreme Court order authorizing the compromise and settlement of the will contest.

Nearly nine months later the Surrogate handed down the heretofore mentioned 96-page opinion. The purpose for writing the opinion is clearly stated in the answer of the Surrogate in this proceeding as follows: "(The attorneys appearing in the proceeding) had been well aware for over two years that the (Surrogate) entertained serious doubts and reservations respecting their activities in Supreme Court and the validity of the order they had secured from that court. * * * the allowance proceeding was the first real opportunity (the Surrogate) had had to renew his inquiries left unanswered two years before."

It is difficult to condense into a few sentences the contents of this 96-page opus. There can be no question that the venom which circulates throughout the opinion was activated by the belief of the Surrogate that the objections to probate of the will were without merit; that he would have summarily dismissed them if a proper motion had been made before him and that all attorneys entered into some kind of conspiracy to deprive him of jurisdiction by seeking relief in Supreme Court. The ultimate action of the Surrogate was to set the matter for a hearing on July 22, 1969. The opinion makes it clear that he had prejudged the application for allowances made by the attorneys and further that his "investigation" had as its object the establishment of his preconceived and fixed opinion that the Supreme Court order (made nearly three years before, which all of the interested parties requested and from which no appeal was taken by any party) was null and void and that the attorneys, including the Deputy Attorney-General, had been guilty of gross professional misconduct.

Thus, under the guise of passing on an application for allowances (which he had already denied with leave to renew by his decision of August 30, 1968) the Surrogate proposed to explore first, the ethical conduct of all attorneys, including the Attorney-General, who had participated in the Supreme Court proceeding, second, the validity of the Supreme Court order and third,

the collusion of the attorneys to prevent the residuary legatees from receiving a bona fide judicial determination on the merits of the issues presented in the will contest proceeding.

Much of this was accomplished in the opinion by asking a series of at least 30 rhetorical questions (none of which was relevant to the questions presented on the application for allowances) the citation of several hundred decisions plus references to innumerable text writers, canons and statutes, followed by a dissertation upon each question which sought to establish either the professional misconduct of the attorneys or the invalidity of the Supreme Court order. These questions ranged over many subjects including the '' hurried '' negotiations for settlement; failure of attorneys for church and executors to move for summary judgment; and consummation of settlement '' in such haste and accorded such little consideration.'' The attack on the Supreme Court order suggested that therein no facts were alleged; that the pleadings presented no triable issue of law or fact; that only arguments and conclusions favoring approval of the compromise were submitted and lastly asked '' Why did the attorneys permit the (Supreme Court) to make 'determinations' which had no basis in fact, law or proof? ''

We start with the legal principle that '' the doctrine of res judicata is that an existing final judgment rendered upon the merits, without fraud or collusion, by a court of competent jurisdiction, is conclusive of rights, questions, and facts in issue, as to the parties and their privies, in all other actions in the same or any other judicial tribunal of concurrent jurisdiction '' (9 Carmody-Wait 2d, New York Practice, § 63:196). '' 'The rule of *res judicata* does not rest wholly on the narrow ground of technical estoppel, nor on the presumption that the former judgment was right and just; but on the broad ground of public policy, that requires a limit to litigation, a curb to the litigiousness of the obstinate litigant. Like the Statute of Limitations, it is a rule of rest.' '' (*Eissing Chem. Co.* v. *People's Nat. Bank of Brooklyn,* 205 App. Div. 89, 91, affd. 237 N. Y. 532.)

Firmly embedded also in our jurisprudence is '' the doctrine that one judge of co-ordinate jurisdicion should not vacate, modify or depart from a ruling or order made by a colleague of equal rank in the same case. The reason for the rule, it has been said, is that any other would render impossible any finality of the decisional process, reduce the administration of justice to anarchistic shambles, destroy the morale of the courthouse, create uncertainty, confusion, and insecurity among the court personnel, place the litigant in a revolving door leading from judge to judge as each judge alters the other's determination,

array the contending jurists in professional fratricidal conflict, partisan in nature, and prevent the ultimate determination of the rights of the parties by appropriate appellate review of a final definitive determination.'' (32 N. Y. Jur., Judges, § 21.)

The application of these principles mandates the conclusion that the order of Supreme Court of October 10, 1966 approving the compromise of the will contest, from which no party appealed, has become *res judicata* and binding on the Surrogate of Jefferson County. Moreover, he of necessity expressly recognized the validity of the order when he made the decree admitting the will to probate. He may not years later under the guise of passing upon an application for allowances undertake to invalidate, malign or cast doubt on the correctness of the determination of Supreme Court. (Cf. *Matter of Wade,* 296 N. Y. 244; *Crouse* v. *McVickar,* 207 N. Y. 213.) In *Crouse* (207 N. Y., at p. 217), the court wrote: '' The court whose decree is assailed had jurisdiction of the subject-matter of the action, and of the parties thereto and jurisdiction to render a judgment distributing the estate of the decedent. It matters not whether that judgment was right or wrong. Until reversed on appeal or set aside it was conclusive.''

CPLR 7801 provides, among other things, that relief previously obtained by a writ of prohibition shall be obtained in a proceeding under that article. CPLR 7803 (subd. 2) further provides that one of the questions that may be raised is '' whether the body or officer proceeded, is proceeding or is about to proceed without or in excess of jurisdiction ''. '' The function of prohibition is not merely to restrain an unwarranted assumption of jurisdiction, but is also to restrain an inferior court from exceeding its authorized powers in a proceeding over which it has jurisdiction, if there is no other adequate remedy available to the petitioner. * * * It has been said that it is ' far better to prevent the exercise of an unauthorized power than to be driven to the necessity of correcting the error after it is committed.' '' (23 Carmody-Wait 2d, New York Practice, § 145:227.) '' It is no argument against granting a prohibition order here, that it will restrain interlocutory, intermediate or incidental proceedings in a suit of which the tribunal to be restrained has general jurisdiction [citing cases].'' (*Matter of Public Serv. Comm.* v. *Norton,* 304 N. Y. 522, 530.)

Minimally, petitioners are entitled to an order, in the nature of prohibition, prohibiting the Surrogate of Jefferson County from taking any proof or testimony or making any decision or order in the proceeding pending before him or any future proceeding in this estate relating to the order made October 10,

1966 by Supreme Court, Onondaga County, in a proceeding entitled "In the Matter of the Application of Margaret Haas Bock and Grace Haas Uhlein, Petitioners, For Approval of an Agreement of Compromise in the Estate of Elizabeth M. Haas, Deceased" including but not limited to, the professional conduct and good faith of the attorneys for the respective parties in that proceeding, the jurisdiction of Supreme Court to entertain the application and the correctness and validity of the order so made.

We further conclude that the proceeding now pending before the Surrogate to fix allowances should be dismissed and those petitioners seeking allowances should be relegated to Supreme Court, Onondaga County, where they may make new applications. It has recently been written that "The law of this State clearly provides that the court in which the trust litigation was conducted is to determine the amount and the source of the awards made to the firms who participated in the trust litigation." (*Matter of Grosner*, 24 N Y 2d 789, 790.) Examination of the affidavits made by the respective members of the two law firms seeking allowances discloses that the services covered the period from March, 1966 to December, 1966 and relate to the contested probate which was terminated in the Supreme Court proceeding by the described order of October 10, 1966. It follows that the Justice who presided thereat is in an equal, if not better, position to pass upon the applications than is the Surrogate.

The proceeding to fix and determine the fees of the attorneys, as stated, was brought under SCPA 2110 (formerly Surrogate's Ct. Act, § 231-a). Prior to the time section 231-a was enacted (L. 1923, ch. 526) an attorney was remitted to a proceeding in Supreme Court or to an action at law. The new (1923) procedure was assimilated to the determination of a charging lien under section 475 of the Judiciary Law (*Matter of Matheson*, 265 N. Y. 81; *Matter of Maggio*, 169 Misc. 1039). In proceedings for determining the valuation of the services of an attorney to his client, Supreme Court and Surrogate's Court have concurrent jurisdiction (*Matter of Britton*, 187 Misc. 70, 77), albeit Supreme Court has exercised this concurrent jurisdiction sparingly (*Crempa v. Oakley*, 9 Misc 2d 583, 584). We here find special circumstances (cf. *Matter of Moody*, 6 A D 2d 861) to support a direction that new applications to fix attorneys' fees should be made in Supreme Court. In passing on such applications Supreme Court may consider all services relating to the will contest whether performed in that court or Surrogate's Court (cf. *Matter of Levine*, 154 Misc. 700, affd. 247 App. Div.

19; *Matter of Proffen,* 175 Misc. 447; *Matter of Ufland,* 175 Misc. 996).

Next, we remind the Surrogate that the matter of disciplining attorneys for professional misconduct is vested in the respective Appellate Divisions (Judiciary Law, § 90). If he has such proof it should be submitted to this court for appropriate action. In fairness to the attorneys, who were the subject of direct accusations, insinuations and innuendos in the Surrogate's opinion and in his answering affidavits in this proceeding, we find no such proof in the record.

We comment briefly on an affirmative defense presented by the Surrogate in his answer. Therein it is alleged, as previously quoted, that petitioners herein (respective attorneys for executors and residuary legatees) in initiating and continuing to prosecute this proceeding are acting in an antithetical manner to the interests of their respective clients; that thereby they have '' breached their obligation of trust and loyalty to their clients * * * [and] have compounded and are continuing to compound the perpetration of a fraud upon their clients and the ultimate beneficiaries of their clients, contrary to law, the canons of professional ethics and public policy.'' Thereafter these mentioned '' clients '' (the executors and two residuary legatees) by formal written instruments have appeared in this proceeding. Moreover, by resolutions formally adopted the respective corporate residuary legatees have stated that they have full confidence in their attorneys and know of no basis in fact to substantiate the charges made by the Surrogate of professional misconduct on the part of their respective attorneys.

Petitioners ask that the Surrogate because of his bias and prejudice be restrained from acting in any matters which may be subsequently brought in this estate. We have no difficulty in concluding that the record amply demonstrates the existence of such bias and prejudice. Thus, in his answer (par. 94) the Surrogate alleges that the residuary legatees will suffer great damage if he should be disqualified indicating that he has presently decided that the residuary legatees are entitled to relief in some form although none has been requested by them. The Surrogate in the interests of justice should give serious consideration to disqualifying himself in future proceedings in this estate. There for the present we let the matter rest.

Petitioners ask that the opinion of the Surrogate be expunged. The parties to this proceeding are in agreement that it decided nothing. The Surrogate in an answering affidavit (par. 9) states that '' it was never intended to determine anything.'' We assume, therefore, that it will not be officially published (cf.

Judiciary Law, § 431). The order to be entered herein, however, will contain a provision that the opinion of the Surrogate dated June 26, 1969 on file in the office of the Clerk of Surrogate's Court of Jefferson County shall be sealed and not opened except upon the further order of this court.

Petitioners are entitled to the relief granted herein. The several cross motions of the Surrogate should be denied.

GOLDMAN, P. J., DEL VECCHIO, WITMER, GABRIELLI and BASTOW, JJ., concur.

Petition granted in accordance with the *Per Curiam* opinion herein, without costs.